IRVING, J.,
Dissenting:
¶ 34. In my judgment, the majority, in reversing Kenivel Smith’s conviction for aggravated assault, places form and technicality over substance. While I have no doubt that my colleagues in the majority believe very strongly that Smith did not receive a fair trial and that reversal is required, I must say that the majority’s decision to reverse Smith’s conviction, given the specific facts in this case, is one of the reasons that the public oftentimes feels that our judicial system is apt to release criminals on a technicality. If I have ever seen such a case, this is one.[9] Therefore, I dissent. I believe that Smith, while not receiving a perfect trial, did receive a fair trial and that the evidence presented is sufficient to uphold his conviction. Therefore, I would affirm.
¶ 35. Having stated my belief that Smith’s conviction should be affirmed, let me be clear that I am a staunch believer in the constitutional protections provided criminal defendants, specifically the right of a criminal defendant to confront and cross-examine his accuser. In this regard, the judiciary must be vigilant and must strenuously safeguard this valuable right, but not to a technical fault. In this case, Smith was able to confront and cross-examine his accuser, and there is ample evidence that he is guilty of the crime charged: shooting Andre Davis because he believed Davis had stolen drugs from him that he had hidden in the woods where Davis and others had hunted. Therefore, there is no legal basis for reversing his conviction, unless of course, form and technical transgressions are elevated to constitutional stature. I believe that is the end result of the majority’s construction of Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the case that according to the majority requires a reversal of Smith’s conviction. I now turn to a discussion of the factual context in which Crawford must be construed.
¶ 36. First and foremost, today’s ease is not factually on all-fours with Crawford, and that is an important point that the majority stubbornly overlooks or refuses to factor in the calculation of its pristine application of Crawford. We do not, and should not, apply a principle of law in a vacuum or out of the factual context in which it was announced, for no principle of law is superior to the facts undergirding it. Nor should a principle be applied subsequently without regard to the factual context attendant to its birth. When we do, *328 we run the risk, in the long run, of corrupting legal precedent and, in the short term, of doing an injustice that has the potential for undercutting public confidence in our judiciary.
¶ 37. What is the principle from Crawford that, in my judgment, is being erroneously applied out of factual context by the majority? It is the principle that the Sixth Amendment right of confrontation prevents the admission at trial of an incriminating testimonial statement by an accuser against a criminal defendant unless the defendant had an opportunity to cross-examine the accuser at the time that the statement was made.
¶ 38. In Crawford, the defendant appealed after being convicted of assault in state court. Crawford, 541 U.S. at 41, 124 S.Ct. 1354. The defendant’s wife, Sylvia, witnessed the altercation and provided police with a recorded statement regarding her husband’s alleged crime. Id. at 66-67, 124 S.Ct. 1354. The assertion of the marital privilege by Crawford precluded Sylvia from testifying at trial. Id. at 40, 124 S.Ct. 1354. However, the trial court admitted Sylvia’s statement, and it was played aloud for the jury. Id. at 65, 124 S.Ct. 1354. The Crawford Court concluded that the prior testimonial statement of the wife was barred because the defendant did not have a prior opportunity to cross-examine the maker of the statement, despite the statement’s reliability. Id. at 68, 124 S.Ct. 1354. Specifically, the Court held that “[wjhere testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation.” Id. at 68-69, 124 S.Ct. 1354. The Crawford Court also held that:
Where testimonial evidence is at issue, ... the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination. We leave for another day any effort to spell out a comprehensive definition of “testimonial.” Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed.
Id. at 68, 124 S.Ct. 1354 (footnote omitted).
¶ 39. In today’s case, Davis gave two out-of-court statements: one was a written statement and the other was an audiotaped statement that was transcribed for the trial. In both statements, given the day following the shooting, Davis identified Smith as the person that shot him. He also stated that he was shot with a 9mm handgun or a .45 caliber handgun. He further stated, in both statements, that Smith had threatened his family. In the audiotaped statement, given to Detective Harold Harris of the Tunica County Sheriffs Department, Davis went into greater details regarding the shooting:
Davis: And so last night Kenivel had called [sic] me on the phone and said, “Bear, I need to talk you [sic].” So, when I get here on Cumberland, he was in John Henry Wilson’s house. And I was like, [sic] “Man, ain’t seen no [sic] drugs, don’t know nothing about no [sic] drugs, don’t fool with no [sic] drugs.” You know, just hunt. I been [sic] hunting [sic] I was a little boy. That’s what I was doing, hunting. I said, “Ain’t never [sic] fooled with you, dealt with you, don’t ride with you, don’t mess ... socialize with you like that right there ... to know of your whereabouts or what you do. And you know he was like, well he just open the door, four shots.
*329 Harris: Oh — he was in a vehicle?
Davis: He was in John Henry Wilson’s house.
Harris: He was in the house?
Davis: On the porch. He opened the door and fired four shots and it ripped one time, right here in my upper thigh.
Harris: Okay. So, were [sic] there a confronta — did he talk to you at all?
Davis: Yeah. He had been by my house, up there to threaten my family.
[[Image here]]
Harris: So, did you see him shoot the gun?
Davis: Yes. I was face to face, like me and you are right now.
Harris: Did you see the gun?
Davis: Ain’t see [sic] the gun, but it looked like it was a .45.
Harris: Look like it was a .45.
Davis: .45. That’s — that’s how big the holder is. [sic] .45. Or a .9mm. One of the two.
Harris: Okay. So, when he — when— when — he sho — you said he was— now — standing in the door when he shot the gun or standing—
Davis: He was standing in the door.
Harris: Did he come out?
Davis: He didn’t come out, ‘cause I ran when he started shooting.
[[Image here]]
Harris: And — the guy that fired the gun at you, what’s — what’s his name?
Davis: Kenivel Smith.
Harris: You saw Kenivel Smith shoot the gun at you?
Davis: Yes.
Harris: Okay. And he — where—where did it hit you at?
Davis: In my upper thigh.
Harris: Okay. How many rounds did you hear him shoot?
Davis: He fire [sic] like four — five shots and then when I ran, he fired a couple more.
Harris: Okay. Anything else you need to tell me that—
Davis: Nawl — [sic]
Harris: — that—that’s in reference to this whole ordeal that I need to know?
Davis: No. ‘cause uh — you know I don’t know nothing [sic] about no drugs or nothing [sic].
Harris: Okay.
¶40. During the trial, Davis was the second witness to testify for the State. He gave detailed information about the hunting trip that he and some individuals, including two of his nephews, had participated in on the day that he was shot. He then gave the following testimony regarding what happened when he returned from the hunting trip:
Q. About what time did you go home?
A. It was about a little before it got just too dark.
Q. Before it got too dark?
A. (Nodding). '
Q. Did anybody go home with you?
A. Yes.
Q. Who went?
A. The guys that was [sic] with me.
Q. What happened when you got to your house?
A. Then I went and turned around and came back around—
* * * *
A. I went up there and turned around and came back out and I’m standing in the yard. I stood in the yard where I had got [sic] me a couple of beers.
*330 Q. I didn’t hear you. You were standing in the yard. And what happened after that?
A. And about fifteen or twenty minutes later shots were fired.
Q. How many?
A. I can’t remember.
Q. Was it more than one?
A. Yes, it was more than one.
Q. More than two?
A. I don’t know, sir.
Q. More than three? You don’t know or you don’t remember?
A. Can’t remember.
Q. You can’t remember. Do you know somebody by the name of Kenivel Smith?
A. Know of him.
Q. You know of him?
A. (Nodding).
Q. Did you know of him that day?
A. No, sir.
Q. Had you met with him earlier that day?
A. No, sir.
Q. You had not?
A. No, sir.
Q. You didn’t — do you know where he lives?
A. No, sir.
Q. Do you know somebody by the name of—
[[Image here]]
Q. James Henry Wilson?
A. Yes, sir.
Q. And who is that?
A. Co-worker [sic].
Q. Do you know where he lives?
A. No, sir.
Q. Going back to the defendant, Keniv-el Smith, you are saying that you did not see him that day?
A. No, sir.
[[Image here]]
Q. After you say that you were shot, what happened after that?
A. After this, my nephew com — this white ear drove up there.
[[Image here]]
Q. I don’t want to know what some'body else said. I want you to tell me what you did after the shot was fired.
A. I ran in the house. But I didn’t know I was shot until my nephew told me, “Andre, you are bleeding.”
Q. You got in the house before you realized you were shot?
A. Yes, sir.
Q. So, prior to you getting shot, you were standing outside?
A. Yes, sir.
[[Image here]]
Q. Do you know where the shots came from?
A. Look like they came across the street, sir.
Q. Do you know who lives across the street?
A. No, sir.
Q. Didn’t you know at that time?
A. No, sir.
[[Image here]]
Q. Now, you said that law enforcement arrived. Did you speak with any of them that night?
A. Yes, sir.
Q. Did you give them a statement that night?
A. Yes, sir.
*331 Q. Do you recall what you said in that statement?
A. No sir, I can’t remember.
Q. You can’t remember. Did you sign any type of document that night?
A. Yes, sir.
Q. And what did you sign?
A. I can’t remember, sir.
Q. You can’t remember. Was it something that you were provided by law enforcement, or what was it that you signed?
A. I can’t remember, sir.
Q. Did you — I’m not worried about what was in the text of the document. What I’m asking, was it signed by you after law enforcement questioned you or was it signed after the ambulance people questioned you? Which one was it?
A. It was signed after law enforcement approached the scene.
Q. You gave law enforcement that statement?
A. Yes, sir.
Q. Did you review that statement?
A. No, sir.
Q. You didn’t review it?
A. Yes, sir.
Q. Did you sign that statement?
A. Yes, sir.
Q. Do you recall the context of that statement?
A. I can’t remember, sir.
Q. But you don’t deny making a statement that night, is that correct?
A. Yes, sir.
Q. And then making the statement with law enforcement, what did you tell them?
A. Can’t remember, sir.
Q. You can’t remember what you told them.
¶ 41. As reflected in the above colloquy, Davis remembered (1) the events surrounding the hunting trip, (2) the shooting incident after he returned home, and (3) the giving of a written statement to law enforcement, although he claimed that he could not remember what he told them. At this point, the State showed Davis the written statement and asked him whether he recognized it. He acknowledged that he did. He then was given an opportunity to review the statement to see if it could refresh his memory. After reviewing the statement, Davis stated that his memory had not been refreshed, and then, without objection from Smith, gave the following testimony regarding the statement:
Q. Looking to the top line of that particular document, now, you are saying that this is the statement that you gave police that night?
A. Yes, sir.
Q. It is your statement?
A. Yes, sir.
Q. Now, when they asked you what happened that night, what did you tell them?
A. Mr. Smith shot me up last night about some drugs.
Q. I’m sorry, I didn’t hear you?
A. Mr. Smith shot me last night about some drugs.
Q. Mr. Smith shot you last night about some drugs?
A. Right.
Q. Is that what you told law enforcement?
A. Yes, sir.
Thereafter, the district attorney, along with Smith’s attorney, approached the bench for a conference with the court. The district attorney argued that Davis’s written statement should be admitted under Rule 804 of the Mississippi Rules of *332 Evidence since the State had shown that Davis was unavailable due to his lack of memory. The trial court dismissed the jury and addressed the State’s argument as follows:
For the record, the State has called Andre Davis, the victim of the crime that we’re trying today. The defendant [sic] has indicated a lack of being able to recall what happened on the day in question when he was shot. Both attorneys agree that [R]ule 804 is where we are looking at to address the issue of the statement made the day after the incident in question. The Court finds that the requirements of 804(a), unavailable as a witness, have been met. The — Mr. Davis indicates lack of memory after the review of the statement. I’m looking at (b) and find under the conditions with which the residual other exception elements that are the litmus test that we review are as follows:
The adverse party must have notice of intent to use. The Court finds that it did because it filed a motion to exclude it. So it did know about this statement.
The statement must have circumstantial guarantees of trustworthiness. It’s admitted by the — by the witness that this is the statement he gave to the police. He recognized the statement that he gave, given one day after the incident in question. The Court finds that there is a circumstantial guarantee of trustworthiness.
Three, it must be offered as evidence of material fact, and that’s obvious. Four and five are, I think, where the rub comes in. It must be more probative than other evidence. And the purpose of the rules, the interest of justice must be best served. So, that’s where we are.
[[Image here]]
What I find is that we are under 804, the residual exception under 804(b)(5). Cummins v. State, [an] '87 case, addressed the hearsay rule, as well as Randall v. State, which is a 2001 case. I’m sure the confrontational [sic] clause was addressed in those. And we’re still down to whether or not the statement is more probative on the issue where it is offered than any other evidence which could be procured reasonably, and the general purpose of the rules, the interest of justice would be best served. So, the court is going to say, and state for the record, that that’s what I’m looking at. So let’s address those two issues—
¶42. As noted in the facts section of this opinion, Smith argued that Davis’s written statement should not have been allowed because it was hearsay testimony. Additionally, Smith argued that the statement was more prejudicial than probative and that its admission was violative of the Confrontation Clause of the Sixth Amendment in violation of Craioford.
¶ 43. Without addressing Smith’s Sixth Amendment argument, the trial court admitted the written statement under Rule 804(b)(5) after finding that Davis was unavailable as a witness within the meaning of Rule 804(a)(3).[10] Rule 804(b)(5) provides:
(b) Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
*333 [[Image here]]
(5) Other Exceptions.
A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.
(Emphasis added). As to Smith’s argument that the statement was more prejudicial than probative, the trial court, after applying the balancing test, found that the probative value was not outweighed by the prejudicial effect.
¶ 44. The jury was returned to the courtroom, and Davis continued his direct-examination testimony as follows:
Q. Do you remember telling the police that night that — or when you talked to them, that Kenivel Smith was the one that shot you?
A. Yes, sir.
Q. You do remember telling them that? A. Yes, sir.
Q. Do you remember telling the police that when they asked you how you knew that it was Kenivel Smith who shot you that night that you saw him shoot you?
A. No, sir.
Q. You don’t remember saying that?
A. No, sir.
Q. Do you remember talking to the police about this that you knew it was him because you were face to face like me and you are right now?
A. No, sir, I can’t remember.
Q. You don’t remember making those statements?
A. I probably made them, but it’s been two years ago, your Honor. Two years ago, I don’t remember anything.
[[Image here]]
A. Yes, sir. It’s been two years ago, your Honor, and I probably wrote a statement with you. I can’t hardly remember what happened two years-ago.
[[Image here]]
BY THE WITNESS: I said I probably made a statement. But since it’s probably been two years ago, your Honor, I didn’t—
BY THE COURT: You made that statement two years ago and you don’t remember what?
BY THE WITNESS: No, sir, I can’t remember.
BY THE COURT: You can’t—
BY THE WITNESS: I can’t remember, no, sir.
BY THE COURT: You can’t remember?
BY THE WITNESS: No, sir.
BY THE COURT: Well, why did you say Mr. Smith did it, in that statement? You said that you reviewed it. Why did you tell them that?
*334 BY THE WITNESS: ‘Cause my nephew, you know, they [sic] was out there and they [sic] said they [sic] saw a car rode — drive by, and—
* * ⅜ ⅜
BY THE WITNESS: Your Honor, the car^ — my nephew said a car rode by. They [sic] said Kenivel was in it. When I was standing in the yard, shots was [sic] fired from across the street. And the other guys come and they said Kenivel was the one guy that shot you.
# * * *
Q. Let me see if I get what you said correctly. You said you [sic] that were told that the shots came across from—
A. Yes.
Q. Do you know if they came from across the street?
A. Yes, sir.
Q. Do you have any memory of telling law enforcement, the day after this happened, that it was Kenivel Smith?
A. Yes, sir.
Q. You do remember saying that?
A. Yes, sir.
Q. Do you remember saying that how you know it was Kenivel and did you see him shoot you, that you had seen him shoot you? Do you remember saying that?
A. No, sir.
Q. Do you remember saying that you were sure it was him because it was face to face just like me and you?
A. No, sir.
Q. You don’t recall saying that?
A. No, sir. Your Honor, I’m so pressured today — and, so pressured today as far as sitting up on the witness stand to where I’m so upset and frustrated right now, your Honor, I can’t remember anything. You know, I’m pressured, pressured, pressured to where, you know, right now I just ain’t focusing.
Q. So, are you saying regardless of what documents you looked at concerning what happened on December 28, 2004, your memory concerning those events will not be refreshed?
A. No, sir.
¶ 45. Because the issue here is whether Smith was convicted based on a statement made outside of court in violation of Smith’s Sixth Amendment right of confrontation, I, at the expense of seriously burdening this dissent, set forth Smith entire cross-examination of Davis, his accuser:
Q. Mr. Davis, I represent Mr. Smith in this matter and I’m going to ask you some questions about this. Earlier, you said that you were under a lot of pressure. Do you remember making that statement just a few minutes ago?
A. Yes, sir.
Q. Wiry do you feel like you are under a lot of pressure?
A. Yesterday, sir, I didn’t want to testify. I was ready to be put in jail if I didn’t.
Q. Who threatened to put you in jail?
A. Detective Harris.
Q. Detective Harris. Is this the same Detective Harris that took this statement?
A. Yes, sir.
Q. Okay. Let’s talk a little bit about— let’s go back to that day in question, okay. You said you were rabbit hunting with friends?
A. Sir?
*335 Q. You were rabbit hunting with some friends?
A. Yes, sir.
Q. What do you use to rabbit hunt with?
A. A shotgun. That’s the only thing you can hunt with, a shotgun.
Q. The only thing you — unless you’re an excellent shot. But you pretty well use a shotgun?
A. If I use something else, it’s a charge. The court will lock me up now.
Q. Sir?
A. You use anything other than that, you’ll be — the court will lock me up now. The game warden will.
Q. The game warden will get you. Okay. So, you were using a shotgun, right?
A. Yes.
Q. And at that time, you were a— you’ve been convicted of drug charges, haven’t you?
A. Yes.
Q. You are a convicted felon, aren’t you?
A. Yes.
Q. Detective Harris knows you are a convicted felon, doesn’t he?
A. Yes, sir.
Q. And so you told me him [sic] were rabbit hunting that day, right?
A. Yes, sir.
Q. And you were using a gun, is that right?
A. Yes, sir.
Q. And you are not supposed to be in possession of a firearm being a convicted felon, are you?
A No, sir. But Mr. Dwight gave me a permit. I had took a class for 30 days to get a permit.
Q. Okay.
A. A hunting permit to carry a gun, mostly shotgun hunting.
Q. Okay. Now, Officer Harris, has he put pressure on you?
A. Yes, sir. Yes, sir, he threatened to put me in jail yesterday. Called the squad car and everything to come get me. Said they had a warrant for me.
Q. Now, has Mr. Smith put any pressure on you?
A. No, sir.
Q. Has anyone promised you [sic] or put any pressure on you on behalf of Mr. Smith?
A. No, sir.
Q. No one has contacted you, promised you anything, or told you' to testify any different than what you are testifying to today?
A. No, sir. Just like to settle my differences and put it in Lord’s hands where I won’t have no more problems then.
Q. Now, those statements that — this tape, I noticed these statements directly conflicted [with] what you said earlier today.
A. Yes, sir.
Q. You stated earlier today that the shots came from the street—
A. Yes, sir.
Q. —or from across the street. And I believe we’ve had a deputy testify, the State’s lead off witness, I believe she testified that the spent shells, the cartridges, were found on the street?
A. Yes, sir.
Q. Do you know where they were found?
A. No, sir.
Q. But in your statement — and this statement was taken a good — do you *336 remember when this statement was taken?
A. I can’t remember, sir. It was two years ago. I can’t remember. But someone to [sic] prison, it’s almost — I said, well, I ain’t got to testify in regards to anybody else [sic].
Q. This statement was taken the day after the incident, correct?
A. The day what?
Q. It was taken the day after the incident, is that correct?
A. I couldn’t remember.
Q. Did you talk to anyone — did you talk to Detective Harris prior to taking — giving this statement that you’ve given?
A. Yes, sir.
Q. Did he or anyone on behalf of the State suggest what you should say in that statement?
A. No, sir.
Q. So, these were your words. No one put these words in your mouth?
A. They were going to lock me up yesterday, sir if I didn’t testify today.
Q. I understand that. They said you were subpoenaed and you had to testify. I’m just trying to get to the truth, okay. And I find inconsistencies in the statement, so I — where—do you recall Mr. Smith shooting you?
A. That what the — I recall the shooting but I never did see a face.
Q. Do you believe — well, you say in your statements that Mr. Smith was face to face. You said he was right there in the corner. He was shooting up into the house?
A. Yes, sir.
Q. Is that what happened?
A. The shots came from the house. I was standing face to face towards the house in my yard.
Q. Now, you stated, I believe on page three, that you were face to face like me and you are right now. And then go on to page four, and you said that he was standing in the door, standing in the door of the house. Is that correct? I mean—
A. I could not say.
Q. You can’t remember. Well, this statement, do you remember today when you said the shots came from the street?
A. Yeah, I was standing — coming from hunting that day.
Q. And the bullets were found in the street?
A. Yes, sir.
Q. You stated in this statement that it was Mr. Smith that you saw face to face. But that can’t be because it was down the street where the bullets were found, the spent casing. We know that’s where the casing came from. He was shot from a semi-automatic, correct?
BY MR. LARRY BAKER: Your [Hon- or], is there a question?
BY THE COURT: I’m sorry, what was your objection?
BY MR. LARRY BAKER: He finally asked a question, but he had a lot of narrative in there in the beginning.
BY THE COURT: I’m sorry, Mr. Baker—
BY MR. GAINES BAKER: I’ll rephrase it.
Q. Did you understand my question?
A. Yes, sir.
Q. You said that the — you’re testifying, you are telling this jury today that the shots came from either out in the street or across the street, is that right?
A. Yes, sir.
*337 Q. And so you are telling the jury today that Mr. Smith was not on the porch?
A. No, sir.
Q. You aren’t telling me that?
A. I didn’t — it was dark. It’s dark in that area up in there.
Q. Okay. Was he on the porch or not?
A. I don’t know.
Q. Did he come to the door and say anything to you?
A. No, sir.
Q. Okay. So when you stated that he was there, you were mistaken about that?
A. Yes, sir, a bunch of promises made, sir.
Q. Sir?
A. A bunch of promises made.
Q. A bunch of promises made?
A. About a charge I have now that’s hanging over my head.
Q. Now, that’s exactly what I want to get to. What charges are made about you — promises you’ve been made about charges hanging over your head? Has somebody made a promise to you?
A. Charging me — I don’t know.
Q. Who is pressuring you to testify today, the State?
BY MR. LARRY BAKER: Objection, your Honor, argumentative.
BY MR. GAINES BAKER: The witness—
BY THE COURT: The State — I’m under subpoena to testify today. Rephrase the question.
Q. Has someone threatened you about charges if you don’t testify against Mr. Smith?
A. They called for me a ride to go to jail yesterday.
BY THE COURT: That would have been contempt of court for failing to show. I don’t know if—
BY MR. GAINES BAKER: Exactly, right.
BY THE COURT: Rephrase your question.
Q. The charges that you were talking about, are you pending [sic] charges— are you under an [sic]?
A. Yes, sir.
Q. Okay. And what have you been told?
A. Sir?
Q. What have you been told about these charges?
A. Well, my lawyer told me don’t worry about them.
Q. Who told you about them — who told you not to worry about them?
BY MR. LARRY BAKER: Objection, hearsay, to what his lawyer told him.
BY THE COURT: Sustained.
Q. Has anyone in law enforcement pressured you to testify the way you’re testifying—
A. Yes, sir.
Q. —on this statement?
A. Yes, sir.
Q. Okay. Well, tell us about that. That’s what we want to hear. We want to know the truth, the truth. The truth is, you didn’t see Kenivel Smith, did you?
A. No, sir.
Q. Have you ever seen Kenivel Smith—
A. Not till [sic] today.
Q. —shooting? Did you ever see him shoot at you?
A. No, sir.
Q. Did you see him shoot at you that night?
*338 A. No, sir.
Q. Was he standing on the porch?
A. No, sir.
Q. Shots came across the street?
A. Yes, sir.
Q. Do you believe Kenivel Smith shot you?
A. I don’t know, sir. I was — I was shot when it happened and I sat down. It — I—I didn’t know I was shot till [sic] my nephew said, “Andre, you are bleeding.”
Q. Did someone tell you to say that Kenivel Smith shot you?
A. No, sir.
Q. So why did you give this statement?
A. ‘Cause my nephew — they [sic]— they [sic] — you know how you hear on the street that Kenivel shot you, and such and such.
Q. So, you heard on the street that Kenivel Smith shot you?
A. Yes, sir.
Q. You are not testifying today that you saw Kenivel shoot you there [sic]?
A. No, sir.
Q. Because in your statement you say that he came to the door and he said something to you and then he shot you. He fired several shots, is that correct?
A. Yes, sir.
Q. That’s not true?
A. No, sir.
Q. So this statement is a falsehood?
A. Yes, sir.
Q. Are you scared if you don’t make that statement today, if you hadn’t of made that statement on that day that you would have pressure put on you by law enforcement? Is that what you’re saying?
A. Yes, sir.
Q. Well, tell — that’s what I want to know. What type of pressure is law enforcement putting on you?
A. Incarceration, sir.
Q. I’m not talking about incarceration tomorrow — for not showing up for Monday. Is that right?
A. Yes, sir.
Q. When did they talk to you about this?
A. It’s been like—
Q. Huh?
A. —two years ago.
Q. So they talked to you the next day?
A. Yes, sir.
Q. And which officer was that?
A. Detective Harold Harris.
Q. So you are saying — is it your statement — it is your sworn statement today, and your testimony in front of this jury — ■
A. Yes, sir.
Q. —that you made this statement and you signed this statement?
A. Yes, sir. I was on my way to work and he ran me down. The deputy just about ran over me to stop me and told me I better come down to the sheriffs department.
Q. So this statement is not true?
A. No, sir.
Q. Why did you give that statement?
A. Afraid, terrified.
Q. Terrified of who [sic]?
A. Of being incarcerated, Detective Harold Harris.
Q. What were you charged with?
A. Possession.
Q. Possession of what?
A. Cocaine.
Q. Is there anything — any truth in this statement?
A. No, sir.
Q. I want you to look the jury in the eyes and tell them this statement is not true?
*339 A. The statement is not true.
Q. You were forced to say that?
A. Yes, sir.
Q. You don’t have any evidence Keniv-el Smith shot you?
A. No, sir.
Q. You didn’t see him?
A. No, sir.
Q. He didn’t come on the porch that night?
A. No, sir.
Q. He didn’t talk to you?
A. No, sir.
Q. The shots didn’t come from the porch. It came from out in the street?
A. Yes, sir.
Q. What did the police do that night? Did they interview any witnesses?
A. No, sir.
Q. Did they take any — did they take any statements that you know of?
A. No, sir.
Q. They didn’t take your statement that night, did they?
A. No, sir.
Q. They waited until the next day?
A. Yes, sir.
Q. And they pulled you off the street?
A. Yes, sir.
Q. And who was that?
A. Detective Harold Harris.
Q. So, basically, all you know today and all you can tell this jury, under your oath, is that you were shot?
A. Yes, sir.
Q. It was dark?
A. Yes, sir.
Q. You didn’t see who shot you?
A. No, sir.
Q. But you are certain that you didn’t see Mr. Smith standing on your porch?
A. Yes, sir.
BY MR. LARRY BAKER: Your Honor, he’s made his point. That’s been asked and answered multiple times.
BY THE COURT: I think he’s about— Redirect.
BY MR. GAINES BAKER: Just a little more testimony.
BY THE COURT: I’m sorry.
Q. So I want to make it absolutely clear in my mind, so the jury can be clear, you made these statements because you felt like you were under pressure?
A. Yes, sir.
Q. And you were under pressure because you were scared of what was going to happen?
BY MR. LARRY BAKER: Your Honor, the same objection. Now, we’re into closing argument.
BY THE COURT: Well, let—
BY MR. LARRY BAKER: He’s already asked this, your Honor.
BY THE COURT: Well, I’m going to let you do your — let him talk. The jury will decide.
BY MR. GAINES BAKER: Judge, one moment. I was about to finish.
Q. Did someone suggest to you to say that Kenivel Smith shot you?
A. No, sir.
Q. Okay. Were you told or the word was out on the street-
A. Yes, sir.
Q. —that Kenivel Smith shot you?
A. Yes, sir.
Q. But you don’t have any evidence of that whatsoever?
A. No, sir.
¶ 46. First, I note that Crawford stands for the proposition that no out-of-court statement that has not been tested in the crucible of cross-examination may be used *340 as evidence against a criminal defendant without running afoul of the Sixth Amendment right of confrontation. It goes without saying that the Sixth Amendment trumps state court rules of evidence. In other words, even if a piece of evidence passes muster under the rules of evidence, it may still run afoul of a criminal defendant’s Sixth Amendment right to confront his accuser. Secondly, as previously noted, the facts of this case are not on all-fours with the facts in Crawford. In Crawford, the unavailable witness never testified. Here, Davis, after being declared unavailable within the meaning of our rules of evidence, testified both on direct examination and on cross-examination. Therefore, it cannot be said that Smith was convicted based on an out-of-court statement that was not tested by cross-examination. It is true that the de-clarant of the statement, Davis, had not been cross-examined when the statement was admitted.[11] However, it is not true that Smith, like the defendant in Crawford, was convicted without first having had the opportunity to cross-examine his accuser. While the jury heard portions of the statement before Davis was cross-examined, jury deliberations did not begin until after Davis had been thoroughly cross-examined. Admittedly, the trial ran amuck procedurally and evidentially. However, the critical question is: did Smith have an opportunity to confront and cross-examine his accuser? I think that he did. Should the written statement have been admitted at the time that it was admitted in light of Crawford? No. Does Crawford mandate a reversal of this case? I think not, because Smith had ample opportunity to cross-examine, and did cross-examine Davis before jury deliberations began.
¶ 47. Although Davis initially testified that he lacked any memory of what he had said in his written statement, later during direct examination and during cross-examination, he testified clearly and forcefully about what transpired on the night of the shooting.[12] Additionally, Smith, during his cross-examination of Detective Harris, offered an offense report, written by Detective Harris, which contained essentially the same information that was in Davis’s written statement. In the offense report, Detective Harris stated: “I (Detective Harris) then went and interviewed the victim (Andre Davis), and he told me that Kenivel Smith shot him over some DOPE. Andre informed me that he was scared for his life and that he wanted to press charges on Kenivel Smith.”
¶ 48. Given these unique facts, I cannot agree that Smith is entitled to a new trial based on Crawford. While I admit that Smith did not receive a perfect trial, I would find, given all that occurred, that he received a fair trial, and he certainly strenuously cross-examined his accuser. I might add that it is very clear from Davis’s cross-examination that he did everything he could do to help Smith. He testified that he was thankful that he still had his life and that he wanted to let bygones be bygones. Based on this testimony, it is reasonable to conclude that Davis’s real reason for not wanting to testify was not a loss of memory or fear of Detective Harris, but a fear of Smith.
*341 ¶ 49. The majority finds that the procedural foul-up was so prejudicial to Smith that he should be given a new trial and that he was essentially convicted on impeachment evidence. It is sufficient to say that such assertion is not borne out by the record. As I have noted earlier in this dissent, Smith himself introduced a piece of evidence (defense exhibit D-l) that identified him as the shooter. It can hardly be argued that exhibit D-l is impeachment evidence or that it should be considered by the jury for limited purposes only. Further, the majority’s assertion that the “Davis” who testified at Smith’s trial was no longer the accusing witness against Smith and that Smith’s true accuser was the “Davis” of December 29, 2004, is nonsensical to me. There was only one Andre Davis. Had Davis not feigned a loss of memory and admitted that he made the statement on December 29 but said that he lied, what would be the effect of such a scenario? The jury would have been entitled to determine whether he lied on December 29 or lied during his testimony at trial. We would have been compelled to affirm because the jury is the ultimate arbiter of the facts.' When you fully and completely analyze what transpired during Smith’s trial, you are left with the inescapable conclusion that first, Davis feigned loss of memory. When that did not work, Davis suddenly had memory recall and testified that the statement that he had given was false. If he had never feigned memory loss, the proceedings would not have wandered off into the unavailable-witness thicket. He would have been impeached by his prior statement. That impeachment evidence, along with exhibit D-1 would have provided a basis for conviction. I should reiterate that exhibit D-l was introduced by Smith during the State’s case-in chief.
¶ 50. I conclude with a comment about the admission of Davis’s written statement and audiotaped statement. I agree that these statements are testimonial, subject to the Crawford, criteria. But for Craio-ford, I believe that the written statement, as well as the audiotaped statement, would have been properly admitted, at the time of their admission, under Rule 803(5) of our rules of evidence that allows admission of recorded recollection when the witness is unavailable. I do not believe all of the criteria was met for admission of the statements under Rules 804(a)(8) and 804(b)(5). However, I will not address this issue in any detail because, in either case, admission must pass muster under Crawford. 1 simply believe the error of admitting the statements was harmless because of the vigorous cross-examination that Smith was able to have before jury deliberations began.
¶ 51. For all of the reasons presented, I dissent. I would affirm Smith’s conviction and sentence.
LEE AND MYERS, P.JJ., JOIN THIS SEPARATE OPINION.

. I do not mean to imply that the majority is rendering Smith's conviction. It is not, but, by reversing Smith’s conviction, it is forcing Tunica County to expend additional county funds if the district attorney decides to retry the case. This of course is all subject to further proceedings, assuming certiorari is sought. Neither do I mean to imply that judges should decide cases based on the anticipated reaction from the public. They should not. Rather, judges should make decisions based solely on the law and the facts of the case, no matter the public reaction, for we are a nation of laws and should always be guided by the rule of law. I do, however, mean to say that sometimes we judges seem to abandon practicality and become too rigid in the application of the law while discharging our roles as guardians of the rule of law.

. Rule 804(a)(3) provides:
(a) Definition of Unavailability. "Unavailability as a witness” includes situations in which the declarant:
[[Image here]]
(3) Testifies to a lack of memory of the subject matter of his statement....

. Although the statement was admitted, the record does not reflect that it was published to the jury at the time of its admission.

. I note that on cross-examination, Davis denied seeing Smith shoot him, and he stated that he had never seen Smith until the day of the trial. According to Davis, he told the officers that Smith was the shooter based on information that his nephew had received from people in the neighborhood. He also stated that he had falsely identified Smith as the shooter in his written statement. He further testified during redirect examination that he had gone to school with Smith and did in fact know him.